**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JOSE A. PEREZ,

                            Plaintiff,

        v.                                     No. 12-CV-623
                                                    (TJM/CFH)

MICHAEL J. AMATO, Sheriff; MICHAEL
FRANKO, Jail Administrator;

                           Defendants.
_____

**APPEARANCES:**                         **OF COUNSEL:**

JOSE A. PEREZ
Plaintiff Pro Se
41 Vanderveer Street
Amsterdam, New York 12010

LAW OFFICE OF THERESA PULEO        MURRY S. BROWER, ESQ.
Attorney for defendants
Post Office Box 12699
Albany, New York 12212

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

     Plaintiff pro se Jose Perez ("Perez"), an inmate previously in custody at a local jail,

brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, the Montgomery

County Sheriff and Jail Administrator, violated his constitutional rights.  Compl. (Dkt. No. 1).

Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P.

56.  Dkt. No. 19.  Perez has not responded to the present motion.  For the following

_____

       [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

reasons, it is recommended that defendants' motion be granted in part and denied in part.[2]

## I.  Failure to Respond

Perez did not oppose defendants' motion. "[J]udgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996).  Defendants' provided such notice in the notice of motion, stating that Perez "must respond by affidavits or as otherwise provided in the rule, setting forth specific facts showing that there is a genuine issue of material fact for trial." Dkt. No. 19 at 1.  Moreover, the Court provided notification to Perez regarding both the date of his response and the consequences of failing to respond.  Dkt. No. 20.  Perez even requested, and was granted, an extension to respond. Dkt. Nos. 21-22.  Despite such notice and the extension, Perez failed to respond.  Because Perez has not responded to raise any question of material fact, to the extent defendants have pled properly supported facts, such facts as set forth by defendants are accepted as true. See Cusamano v. Sobek, 604 F. Supp. 2d 416, 452-453, 453 n.48 (N.D.N.Y. 2009); see also N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.") (emphasis in original).

---

[2] Defendants move for summary judgment contending that (1) Perez's Equal Protection claims were meritless; (2) they are protected by qualified immunity;(3) Perez has failed to allege a physical injury sufficient to grant him the damages he seeks and (4) Perez's state law claims need to be dismissed for his failure to comply with the notice of claim requirement.  Defs Mem. of Law (Dkt. No. 19 at 6-15) at 4-9.  Defendants fail to discuss the merit of Perez's inartfully pled First Amendment legal mail claims or any potential due process claims which, for the reasons stated infra, should not be dismissed.

2

## II. Background

### A. Involuntary Protective Custody

Revised in January 2010, Montgomery County Correctional Facility ("Montgomery") had a specific policy regarding administrative segregation for protective custody. Dkt. No. 19-1 at 51, 54. After an inmate had undergone screening and classification, he could be assigned to protective custody, being locked in his cell for twenty-three hours a day for a sixty day period of time. Id. at 54. However, the inmate could seek review of said classification, through a written request to the jail administrator, after sixty days provided "there [wa]s no further threat to [the inmate's] safety . . . ." Id. If such a threat remained, the inmate's situation may be re-evaluated every thirty days until such time as the threat dissipated. Id.

Perez arrived at Montgomery on December 19, 2011 for a parole violation. Franko Aff. (Dkt. No. 19 at 36-42) § 2; Dkt. No. 19 at 48 (Montgomery New Admissions form indicating that Perez was detained for a parole violation). Upon arrival, all inmates are processed and evaluated for placement in the appropriate housing unit consistent with the policy outlined above. Franko Aff. ¶ 3; Id. ¶ 6 (explaining that classification officers consider an inmate's "past criminal history . . . and information if that person has been in the jail on other occasions," as well as interviewing the inmate). Perez's classification was determined after evaluating "the charges pending and his past history of [sex based] criminal offenses . . . [for which defendants concluded that Perez] was therefore considered to be vulnerable to injury from inmates housed in the regular population." Franko Aff. ¶ 5; see also Dkt. No. 19 at 58-61 (inmate classification form awarding (1) ten points for a request or requirement of administrative segregation for safety purposes; (2) three points for a previously being

3

detained at Montgomery; (3) twenty points for current charges of a parole warrant; (4) twenty points for a prior violent felony or sex offense; (3) various points for substance abuse and having a mental health history; and (4) twenty points for having a pending warrant regarding a violent felony or sex offense felony and determining that Perez required protective custody and close supervision despite a lack of any victimization history "due to convictions, previous, safety [and] security of facility.").

After spending approximately one day undergoing classification, on or about December 20, 2011, Perez received notification that Classification Officer Payne had administratively segregated Perez into involuntary "protective custody [hereinafter "IPC"] for his own personal safety."  Dkt. No. 19 at 51; but cf Franko Aff. §§ 3-4 (indicating that Perez was placed into IPC on December 20, 2012 but that his classification was completed on December 26, 2011 whereupon he was still classified as an IPC inmate).  Perez signed the Administrative Segregation Notice Form indicating that he was being placed in IPC for his own protection.  Dkt. No. 19 at 51.

"In the late fall of 2010 and continuing into the winter and spring of 2011[] the inmate population of Montgomery . . . was growing[; thus] the Sheriff and [Administrator] began to discuss how the rising population might impact the safety of inmates and . . . of corrections officers assigned to the various pods . . . . " Franko Aff. ¶ 8.  Specifically during this time period, there was "a rise in the population of sex offenders[, which] . . . was a concern given that sex offenders are often victimized in a correction setting when housed in the general population."  Franko Aff. ¶ 9.  This also caused a concern for the safety of the correctional staff "who intervene to break up fights and provide a higher level of protection to the vulnerable population."  Id.

4

While in IPC, it is undisputed that Perez was locked in his cell for twenty-three hours a day, with one hour of recreation during which he could use the phone or shower.  Franko Aff. ¶ 10 (confirming that the sex offenders were locked down for twenty three hours a day because "[w]hile [defendants] would have liked to have given each of the persons housed at the jail the ability to move about the pod, this was not possible because of the number of persons the facility was housing and . . . the then current staffing levels."); Id. ¶ 11 (explaining that IPC inmates "were not given the option to join the general population [yet w]hile in [IPC, inmates] . . . were allowed out of their cells for one hour each day for recreation, showers, etc.").  During the time period in question, while he was in IPC, Perez was upset that defendants "tamper[ed] with [his] legal mail and discriminat[ed against him] by [classifying him] in [I]PC against [his] will."  Compl. at 4.

Defendants emphatically state that placement in IPC was not punitive, but prophylactic.  Franko Aff. ¶ 14 (explaining IPC placements were "intended primarily to address the conditions at the jail of a higher than normal population of sex offenders who belong to a class of inmates who are most often targeted for victimization.").  Defendants also contend that IPC inmates could participate in educational activities, just not with those inmates in general population, and shower during recreation.  Franko Aff. ¶ 13.  While Perez states that defendants tampered with his legal mail, nothing in Perez's file shows he ever "filed a grievance about alleged tampering with legal mail or claimed that he was slandered."  Franko Aff. § 17.

Perez proffers that he asked for a grievance form and was refused.  Compl. at 2.  Pursuant to "State of New York Commission of Corrections [(hereinafter "COC")] rules, classification and placement in [IPC] is not grievable . . . ."  Franko Aff. § 15.  Additionally,

Perez's file "does not [contain a request for Franko to] . . . review his classification . . . ." Id. Franko asked Officer Payne to review Perez's classification status on March 19, 2012. Franko Aff. ¶ 15; see also Dkt. No. 19 at 54-57 (inmate classification form completed by Officer Payne on March 21, 2012). Concurrently, in March of 2012 it was suggested to Franko, by a COC representative that IPC inmates' classifications be reviewed "to ensure that those in [IPC] . . . needed to be there." Franko Aff. § 15; see also Dkt. No. 19 at 51 (indicating that "at the behest of . . . COC, [Perez's] classification has been reviewed" and ultimately discontinued). As a result, Perez was reclassified and taken out of IPC. Franko Aff. ¶ 15; Dkt. No. 19 at 56.

Defendants assert that during the meeting with the COC, Franko "was informed that [Montgomery's] classification scheme was not incorrect [and] . . . th[e] evaluation forms being used did not discriminate . . . It was merely suggested that . . . Montogomery . . . review its procedures to insure that those in protective custody needed to be there." Franko Aff. ¶ 21. Perez spent approximately three months in IPC custody.

### B. Prior Incarcerations at Montgomery

Perez was previously incarcerated at Montgomery in 1999, 2005, and most recently, for a parole violation in 2011. Franko Aff. § 2. In May of 2005, Perez was charged with a sexual offense. Dkt. No. 19-1 at 14. He underwent a slightly different classification whereupon he was awarded (1) thirty-three points for the severity of his current charges of a violent felony or sexual offense felony and (2) ten points for prior misdemeanor charges. Dkt. No. 19-1 at 21-23. Perez received a medium classification and "was offered protective custody – he declined, stat[ing] that he will advise [Montgomery] if he has problems." Dkt.

No. 19-1 at 24.

Perez was next violated on parole in November of 2010, appearing intoxicated upon his admission to Montgomery.  Dkt. No. 19 at 81.  Classification was pursuant to identical categories and the same form as that utilized during the time in question.  Perez was awarded (1) ten points for requesting or requiring administrative segregation for safety; (2) twenty-two points for current charges of a parole warrant; (3) twenty points for a prior violent felony or sex offense felony; (4) nine points for alcohol dependance issues; (5) twenty-five points for a mental health history; (6) fifteen points for institutional misconduct; and (7) forty points for assault or attempted assaults on staff or inmates, resulting in a close custody classification and IPC because Perez was "[f]ound guilty of assault and fighting [in] . . . 2000 with another inmate [as well as] for [his] own personal safety due to previous charges . . . [and presumably, his self-admitted] alcohol problem."  Dkt. No. 19 at 71; <u>see</u> <u>also</u> Dkt. No. 19 at 68 (Administrative Segregation Notice Form signed by Perez on November 25, 2010).

### III.  Discussion

In his complaint, Perez seeks "comprehensive, punitive, damages, [sic] of slander, ctitisizim [sic], tamperin [sic] with [his] legal mail and discrimination by putting [Perez] in [I]PC against [his] will."  Compl. at 4.  Such bare and conclusory claims are impossible to decipher.  However, liberally reading that claim in conjunction with the inmate record that defendants provided, along with defendants' moving papers, Perez's complaint can be construed to present Fourteenth Amendment claims alleging due process and equal protection infringements, as well as a First Amendment violation.  Defendants seek dismissal contending that (1) Perez's Equal Protection claim is meritless; (2) they are

7

entitled to qualified immunity; (3) the Prisoner Litigation Reform Act ("PLRA") precludes any recovery given the lack of physical injuries; and (4) the Court should refuse to exercise supplemental jurisdiction over Perez's slander claims.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477

(2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247–48.


## B. First Amendment

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."  Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted).  In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" Id. (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518

9

U.S. 343, 351 (1996)). Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." <u>Warburton v. Underwood</u>, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) (citations omitted); <u>Shine v. Hofman</u>, 548 F. Supp. 2d 112, 117-18 (D. Vt. 2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the Constitution guarantees only the tools that inmates need in order to attack their sentences . . . and . . . challenge the conditions of their confinement.") (internal quotation marks and citations omitted). Accordingly, without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established. <u>See</u> <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 (2002) ("[T]he underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

Perez's claims fail to establish any sort of plausible First Amendment claim. All Perez states, in a conclusory manner, is that defendants tampered with his mail. Perez fails to include any facts about when, what or how often said tampering occurred. Moreover, Perez fails to indicate what injury he sustained as a result of said tampering.

"A prisoner's right to receive and send mail, however, may be regulated." <u>Johnson v. Goord</u>, 445 F.3d 532, 534 (2d Cir. 2006) (citations omitted). While legal mail is afforded the greatest protection, "greater protection [is afforded] to outgoing mail than to incoming mail." <u>Davis</u>, 320 F.3d at 351 (citations omitted). The Second Circuit has determined two different tests by which to evaluate whether infringements on inmate correspondence were constitutionally justified. <u>Compare</u> <u>Davis</u>, 320 F.3d at 351 ("Restrictions . . . are justified only if they further one or more of the substantial governmental interests of security, order,

10

and rehabilitation and must be no greater than is necessary or essential to the protection of the particular government interest involved.") with Johnson, 445 F.3d at 534-35 (applying the Turner test to prisoner's challenge on regulating mail which asks whether (1) there is "a valid, rational connection between the prison regulation and the legitimate government interest . . . [(2)] whether there are alternate means of exercising the right [for inmates; (3)] . . . the impact accommodation of the right . . . will have on [DOCS; and (4)] . . . proposed alternatives.") (internal quotation marks and citations omitted).

To the extent a policy exists for inspecting mail, defendants explain that:

> [e]ach piece of mail that is received at . . . Montgomery . . . is screened for contraband. No mail is opened or read that is sent to an inmate or received by an inmate. Each piece of mail received is logged on records maintained by . . . Montgomery . . . Perez has not identified when or what portions of his mail he alleges were tampered with and therefore no records have been provided.

Franko Aff. § 23. Regardless of which test is utilized, defendants' policy of inspecting mail to prohibit contraband from entering the facility is justified. Thus, to the extent this policy did result in any potential interference, such actions were justified. These regulations touch at the heart of defendants' duties to protect government's security and order and are no greater than necessary. As Franko outlined, mail is screened but not unilaterally and discriminately opened. Furthermore, a general screening policy is consistent with legitimate penological interests. See e.g. Wolff v. McDonnell, 418 U.S. 539, 575-76 (1974) (explaining that while the First Amendment protects against censorship of mail, "freedom from censorship is not equivalent to freedom from inspection or perusal.") (citations omitted).

Accordingly, to the extent Perez attempts to articulate a First Amendment claim, such contentions are insufficient to establish a constitutional violation.

11

### C. Fourteenth Amendment

### 1. Due Process[3]

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. Amend. XIV § 1.  It is important to emphasize that due process "does not protect against all deprivations of liberty.  It protects only against deprivations of liberty accomplished without due process of the law."  Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted).  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies."  Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).  An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995).

### a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection.  See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460

---

[3] Defendants' memorandum of law did not address any due process issues.

12

(1989)).  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998).  This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life.  See Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).  This analysis is applicable to confinement for either punitive or administrative reasons.  Arce v. Walker, 139 F.3d 329, 334-35 (2d Cir. 1998).

   While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality.  Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).  The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights."  Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted).  Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required."  Id. at 64–65 (citing Colon, 215 F.3d at 232).  In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law."  Id. at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality.  Id. (citing Colon, 215 F.3d at 231–32).  Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims

where the period of time spent in SHU was short – e.g. 30 days – and there was no indication [of] . . . unusual conditions." Harvey v. Harder, No. 09-CV-154 (TJM/ATB), 2012 WL 4093791, at *6 (N.D.N.Y. July 31, 2012) (citing inter alia Palmer, 364 F.3d at 65-66).[4]

### i. Initial Placement in IPC

New York regulations require "chief administrative officer[s] of each [local or county] correction facility [to] establish, implement, and maintain a formal and objective system for the consistent classification of all inmates." N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013.1. These detailed regulations provide (1) various classification categories (Id. § 7013.4); (2) provisions for a screening instrument which records information regarding the inmate's physical and mental health, criminal history, incarceration history, and any other relevant information (Id. § 7013.7); (3) requirements that classification be generally determined within five business days of admission into the facility (Id. § 7013.8); and (4) conditions under which an inmate's classification should be changed (Id. § 7013.9).

The Montgomery policies regarding classification reference the above regulations. Dkt. Dkt. No. 19-1 at 54. Specifically, the Montgomery policy states that initial screening and risk assessment will occur and classification will generally happen within five business days. Id. (citing N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013). Additionally, the policy provides that

> INMATES WHO . . . HAVE BEEN ASSIGNED TO PROTECTIVE CUSTODY SEGREGATION AFTER THE COMPLETION OR DURING THEIR CLASSIFICATION SCREENING WILL BE SUBJECT TO A 23 HOUR A DAY LOCK IN STATUS AND WILL BE HOUSED SEPARATELY FROM GENERAL POPULATION, FOR A MANDATORY 60 DAY PERIOD OF TIME. AFTER 60

---

[4] All unreported decisions are attached as exhibits to this Report-Recommendation.

14

> DAYS YOU MAY REQUEST, IN WRITING, TO THE JAIL
> ADMINISTRATIVE OFFICER A CHANGE IN YOUR PROTECTIVE
> CUSTODY STATUS. IF IT IS DETERMINED THAT THERE IS NO
> FURTHER THREAT TO YOUR SAFETY, YOU WILL BE TAKEN
> OUT OF PROTECTIVE CUSTODY AND MOVED INTO GENERAL
> POPULATION. HOWEVER, IF IT IS DETERMINED THAT A
> THREAT TO YOUR SAFETY STILL EXISTS, YOU WILL BE KEPT
> IN PROTECTIVE CUSTODY AND YOUR SITUATION WILL BE
> RE-EVALUATED EVERY 30 DAYS AFTER UNTIL SUCH TIME
> THAT NO THREAT EXISTS.

Id. (citing N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013) (emphasis in original). While not specifically articulated in the policy, defendant Franko affirmed, and the jail intake forms corroborated, that the same categories were used when classifying inmates as those articulated in the New York regulations. Most specific to this case was Perez's past criminal history and sex offender status.

It is undisputed that initially, during classification, Perez spent a day segregated for classification purposes. This time, in and of itself, is insufficient to establish a protected liberty interest.

Moreover, "[t]he [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995) (internal quotation marks and citations omitted). The balancing test articulated in Turner v. Safely has been deemed uniquely instructive in considering whether "a prison regulation infringing on an inmate's constitutional rights is valid[,] so long as the regulation is reasonably related to the legitimate penological interests." Harvey, 2012 WL 4093791, at *7 (citing Turner, 482 U.S. at 89).

> The Turner Court determined that the four factors to be considered
> are: 1) whether there is a rational relationship between the

> regulation and the legitimate government interests asserted; 2)
> whether the inmates have alternative means to exercise the right;
> 3) the impact that accommodation of the right will have on the
> prison system; and 4) whether ready alternatives exist which
> accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

A recent case in the Northern District of New York has already deemed the initial,

temporary segregation of an inmate in a county jail during classification procedures valid

and not an infringement upon due process protections.  Harvey, 2012 WL 4093791, at *7.

In that case, the county jail had identical initial classification policies also based on the New

York regulations.

> Until an inmate is screened for prior violence; propensity for
> victimization; possible enemies; behavior; and adjustment, the
> facility administrators have no way of knowing where the best place
> to house the inmate will be.  Thus, a short classification period in
> administrative segregation in order to complete this objective is a
> completely reasonable restriction on an inmate's liberty.

Harvey, 2012 WL 4093791, at *7.  For substantially similar reasons, to the extent that Perez

challenges his initial classification period spent in segregation, such contentions are

insufficient to establish a due process violation.


### ii.  Continued Placement in IPC

As previously explained, duration of confinement alone is not a dispositive factor in

determining whether due process rights were infringed.  Defendants continually contend that

Perez's confinement was administrative and prophylactic, not disciplinary.  See e.g. Colon v.

Goord, No. 05-CV-129 (TJM/GJD), 2008 WL 783364, at *7 (N.D.N.Y. Mar. 20, 2008)

(explaining that in the NYS Department of Corrections and Community Supervision

16

("DOCCS") facilities, which fall under different regulations but have analogous housing classifications, "IPC is ***not*** a disciplinary unit . . . .") (emphasis in original). However, the undisputed housing conditions for Perez in IPC, particularly being locked in one's cell for twenty-three hours a day, were more analogous to disciplinary confinement than segregation. <u>See</u> <u>e.g.</u> <u>Id.</u> (explaining that in the DOCCS facilities "IPC inmates are afforded more privileges and have less restrictions than Ad[ministrative] Seg[regation] inmates . . . [who] are subject to the same restrictions as disciplinary S[pecial ]H[ousing ]U[nit] inmates . . . ."). This was acknowledged by the COC when it urged Montgomery to reevaluate the classification of all IPC inmates, to ensure that the classification was resulting in the appropriate inmates being housed under such restrictive conditions. Accordingly, although not quite as long as the intermediate standard articulated above, the fact that Perez spent an additional three months in IPC, in the aforementioned environment, is sufficient to satisfy the <u>Sandin</u> atypical environment test so that a liberty interest, protected by due process, has been established.

As a form of administrative segregation, as opposed to disciplinary confinement, placement in IPC "requires only an informal, nonadversary review." <u>Smart v. Goord</u>, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006). The procedural due process protections are minimal, dictating that the informal review must occur within a reasonable time, after the inmate has had some notice of the charges lodged against him and an opportunity to present his views to the administrator making the determination about segregation. <u>See</u> <u>e.g.</u> <u>McClary v. Kelly</u>, 4 F. Supp. 2d 195, 212 (W.D.N.Y. 1998) (citing <u>Hewitt . Helms</u>, 459 U.S. 460, 460, 476 (1983)). Moreover, the "prison officials must engage in periodic review of the decision . . . to ascertain whether a prisoner remains a security risk . . . [which is] supported by some

evidence." Id. at 212-13 (internal quotation marks and citations omitted). Lastly, "administrative segregation may not be used as a pretext for indefinite confinement[, so] . . . periodic reviews [cannot be] a sham; the reviews must be meaningful and not simply perfunctory." Id. at 213 (citations omitted); see also Covino v. Vermont Dep't of Corr., 933 F.2d 128, 130 (2d Cir. 1991) (explaining that "[a]t some point, however, the administrative necessity for involuntary lock-up begins to pale . . . [and] smacks of punishment.").

Initially, Perez received a document that indicated that because of his criminal history, he was to be placed in IPC. Perez signed the form, which served as notification of the administrative segregation, as well as the initial opportunity for Perez to express his displeasure with his classification. Both appear to comply with the minimal procedures guaranteed by the Due Process clause.

The Montgomery policy indicated above details that the prison officials were supposed to review the IPC inmates' files after sixty days and then, if the danger were deemed to still persist, every thirty days thereafter. Moreover, inmates were allowed, after the initial sixty day period, to seek review of their classification in IPC. It is unclear what effort Perez made to file a grievance or seek review regarding his classification. Pursuant to the complaint, Perez asked for a grievance and was advised that the classification status was not grievable, but it is unclear what direction he received, if any, informing him of the proper avenues for complaining about such placement.

Liberally construing the facts in the light most favorable to Perez, regardless of whether he properly sought reclassification, nothing in defendant Franko's affidavit indicates that facility staff engaged in the periodic review of Perez's confinement outlined in the facility's procedures. While a "lack of specificity . . . [regarding] the dates of the reviews *or* the

18

specific decision[s]," is not required, it is clear that there needs to be some evidence that a meaningful review occurred. See Colon, 2008 WL 783364, at *9 (explaining that a meaningful review occurred even where the inmate received short, cursory memoranda "indicating that his circumstances had not changed, and his IPC status was being continued," as the record demonstrated through several affidavits that the inmate's case was carefully and regularly contemplated and defendants unsuccessfully attempted to transfer him on several occasions to a safer facility where housing in the general population was possible) (emphasis in original). No such evidence presently exists on the record before the Court. Accordingly, Perez's "allegations raise the possibility that []he was confined in IPC without meaningful review or sufficient process," and defendants have not provided sufficient factual support to quell such disputes in material facts. Smart, 441 F. Supp. 2d at 642.

Additionally, to the extent that defendants may rely on the Turner analysis above to relieve them of responsibility in the face of a potential constitutional infringement, such reliance is misplaced. First, it does not appear that defendants followed their own regulations with respect to periodic reviews of the inmates; thus, the Turner analysis is inappropriate. See Nolley v. County of Erie, 776 F. Supp. 715, 739 (W.D.N.Y. 1991) (explaining that the Turner analysis is applicable where it is argued that "an otherwise valid regulation impinges on a plaintiff's constitutional rights, but [not] where the defendants fail[] to follow even their own regulations."). However, it is unclear that defendants did not perform any kind of review, so a question of material fact exists.

Second, even assuming the Turner analysis did apply, defendants have still failed to proffer sufficient evidence to establish the absence of a question of material facts.

19

Defendants repeatedly state that housing inmates with a criminal history of sex crimes or with a sex offender status was not punitive, but rather prophylactic, as these inmates represented a risk to safety and security of the facility. Defendants have proffered an affidavit from Franko which indicates that inmates with sex offender status were generally more vulnerable and susceptible to victimization, the population of the jail was increasing without a concomitant increase in the number of corrections officers, and that increase was attributed primarily to larger numbers of sex offenders entering custody. Other districts have deemed an inmate's sex offender status to represent a safety issue requiring protective custody. See e.g. Tucker v. Royce, Nos. 09CV35-MPM-JAD, 09CV106-MPM-JAD, 10CV4-MPM-JAD, 2011 WL 541116, at *6 (N.D.Miss. Feb. 8, 2011) (denying Eighth Amendment claims regarding IPC classification because the inmate "was placed in [IPC] for a reason: as a sex offender, he was vulnerable to assault from other inmates . . . ."). Moreover, the Second Circuit has discussed, though not explicitly commented on the constitutionality of the policy of offering IPC to inmates with sex offender histories. See Arnold v. County of Nassau, 252 F.3d 599, 601 (2d Cir. 2001) (explaining in an action alleging failure to protect, and not a due process violation, that the inmate was initially placed into IPC "pursuant to 'Warden's Order: Sex Crimes,' an order designed to assure that inmates charged with sex crimes are removed from the general prison population because they are a greater risk of assault by other inmates.").

However, the present record proffers nothing more than conclusory assertions about the circumstances faced by defendants at Montgomery. Defendants have failed to provide any documentation regarding information including specific numbers of the inmate population and the percentage of sex offenders previously housed at Montgomery, that population's

anticipated increase in comparison to the rest of the incoming inmate population, or the number of attacks on sex offenders or those with a sexually based criminal history. See Smart, 441 F. Supp. 2d at 645 (denying qualified immunity because defendants failed to demonstrate anything more than "conclusory statements" about safety concerns essentially providing the court with "no showing that there was any reason to fear for [the inmate's] personal safety.").

Furthermore, Perez's inmate file evidences that he was previously housed at Montgomery on another occasion after his sex offense conviction. While he was housed in IPC at that time, records indicate that concerns included not just his prior criminal history, but his history of previously assaulting an inmate while incarcerated and his self-admitted alcohol dependancy. Conversely, during the present classification, there was no mention of either the assault or substance abuse history. Instead, classification in IPC was premised solely on Perez's prior criminal history. On this record, Perez's classification history seems inconsistent and presents questions of fact surrounding the legitimacy of defendants claims that all sex offenders were prone to victimization and thus were required to be housed in IPC for prophylactic measures.

Accordingly, to the extent that procedural due process claims are intimated regarding Perez's continued confinement in IPC, material questions of fact exist so that such claims should remain as litigation moves forward.

### b. Substantive Due Process

Liberally reading Perez's complaint, it appears he has also alleged a substantive due process claim concerning his placement and continued confinement in IPC based on his

criminal history. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense . . . but not against government action that is 'incorrect or ill-advised'" Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir.1994) (internal citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Okin v. Villiage of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). As already observed by the Northern District of New York, "[v]ery few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process. In Sandin v. Conner, the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs." Samms v. Fischer, No. 10-CV-349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar. 25, 2011) (citations omitted).

In this case, while the actions of defendants in articulating a policy which summarily housed a population of inmates in IPC pursuant to potentially legitimate concerns related to inmate facility and security could be categorized as incorrect or ill-advised, it does not appear that such a policy was arbitrary, conscience shocking, or constitutionally oppressive. Moreover, given the limited number of recognized circumstances where substantive due process is advanced, and the dissimilarity between those instances and the present claim, to the extent that Perez is attempting to advance such due process arguments, they are insufficient to establish a constitutional claim.

## 2. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").  "[A]bsent classification by race, alienage or national origin, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  Vargas v. Pataki, 899 F. Supp. 96, 98 (N.D.N.Y. 1995) (citations, quotation marks, and internal alterations omitted).  Accordingly, strict scrutiny shall only be employed "where the classification involves a fundamental right or a suspect class."  Id. (citations and quotation marks omitted).

If an inmate is unable to establish membership in a protected class, "the Supreme Court has recognized 'class of one' claims, where the plaintiff must prove that he was intentionally treated differently from others similarly situated without a rational basis for the difference in treatment."  Fortunatus v. Clinton County, N.Y., No. 12-CV-458 (RFT), 2013 WL 1386641, at *11 (N.D.N.Y. Apr. 4, 2013) (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).  Such plaintiffs

> must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves . . . [and] must establish that (1) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) (citations omitted). "Generally, whether parties are similarly situated is a fact-intensive inquiry," best suited for the jury, unless "no reasonable juror could find that the persons to whom plaintiff compares itself are similarly situated," and then summary judgment is appropriate. Id. (citations omitted).

Prisoners are not a part of a suspect class. Scott v. Denison, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) (citations omitted); Lee v. Governor of State of New York, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class . . . ."). "[S]ex offenders [also] do not compromise a suspect or quasi-suspect class . . . [thus any] allegedly different treatment is subject to rational basis scrutiny, that is, it must be rationally related to a legitimate state interest." Taylor v. New York State Dep't of Corr. Servs., No. 07-CV-1288 (NAM/RFT), 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2009) (citations omitted).

In this case, a question of fact remains as to Perez's Equal Protection claim. Both sides agree that Montgomery's policy was to summarily classify and house all sex offenders in IPC for their own safety. Therefore, sex offenders were treated differently from all other inmates who were generally housed in, and accorded the amenities of, general population. Perez has successfully established a high degree of similarity between himself and the other sex offenders and such similarity and difference in treatment are undisputable so that mistake is not a reasonable possibility.

As previously discussed, defendants have proffered affidavits indicating that their policy of confining sex offenders and those with sexual offenses in their criminal history to IPC was based on a legitimate concern for safety in the prison given the increasing number of inmates and stagnant number of staff. Furthermore, for the reasons articulated above,

24

there are questions of fact which surround the legitimacy of Montgomery's policy given the

lack of factual and statistical evidence.  Conversely, if defendants' claims are proven to be

more than conclusory, a rational basis may be deemed to exist.  Accordingly, defendants'

have failed to provide sufficient evidence to establish that no question of material fact exists

regarding the reasons defendants are proffering for segregating sex offenders to IPC.

Accordingly, defendants' motion on this ground is denied.


### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity

generally protects governmental officials from civil liability "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.

Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov.

10, 2003).

> [A] decision dismissing a claim based on qualified immunity at the
> summary judgment state may only be granted when a court finds
> that an official has met his or her burden demonstrating that no
> rational jury could conclude (1) that the official violated a statute or
> constitutional right, and (2) that the right was clearly established at
> the time of the challenged conduct.

Coollick v. Hughes, 699 F.2d 211, 219 (2d Cir. 2012) (quoting Ashcroft v. al-Kidd, 131 S.Ct.

2074, 2080 (2011)) (internal quotation marks omitted).  The Supreme Court has granted

district courts "discretion to decide which of the two prongs . . . to tackle first [in order to] . . .

save[] judicial resources by avoiding unnecessary decisions whether certain conduct

violates a constitutional or statutory right, which it is beyond reproach that the conduct was

not objectively unreasonable in light of existing law." Id. (internal quotation marks and citations omitted).

A constitutional right is clearly established if it is both reasonably specified and affirmed by both Supreme Court and Second Circuit case law and understood to be viewed by a reasonable defendant as unlawful under the status of the law at the relevant time in question. Looney v. Black, 702 F.3d 701, 706 (2d Cir. 2012). Such an inquiry is context-specific, looking at "the contours of the right" which is alleged to be protected so that "the very action in question [need not] ha[ve] previously been held unlawful; but . . . in the light of pre-existing law the unlawfulness must be apparent." Doninger v. Niehoff, 642 F.3d 334, 345-46 (2d Cir. 2011) (internal quotation marks and citations omitted).

Defendants contend that their decision to institute a policy segregating all inmates labeled as sex offenders or with sexually violent crimes in their criminal histories into IPC is protected by the qualified immunity doctrine. While there is no New York regulation concerning the placement or review of an inmate in local custody being placed into IPC, or a case which has been decided presenting identical facts, the constitutional rights surrounding an individual's right to due process and to remain housed in a manner presenting neither atypical nor significantly different circumstances than ordinary prison life were clearly established at the time of the case. See Sandin v. Conner, 515 U.S. 472 (1995); Wright v. Coughlin, 132 F.3d 133, 136-38 (2d Cir. 1998) (discussing how duration and conditions of confinement serve to illustrate the atypical and significant requirement created by Sandin). Moreover, the right of an inmate in administrative segregation to receive informal, periodic reviews was also clearly established. See Hewitt, 459 U.S. at 476, 477 n.9 (deeming informal, non-adversarial procedures sufficient for administrative segregation and requiring

periodic and meaningful reviews of continued confinement to preclude such confinement as a pretext for indefinite punishment).  As was an inmate's right not to be treated different than others unless a rational basis existed.  See Lee v. Governor of State of New York, 87 F.3d 55, 60 (2d Cir. 1996) (citing City of Cleburne v. Cleburne Living Ctr, Inc., 473 U.S. 432, 440 (1985)).  Accordingly, it is apparent that Perez's Fourteenth Amendment rights to Due Process and Equal Protection were clearly established at the time in question.

Defendants contend that because of increased inmate populations, legitimate concerns for the safety and security of the institution, inmates, and staff compelled IPC for inmates like Perez.  Similar scenarios make it clear that a holding an inmate in segregation, under adverse conditions, without a legitimate basis, and without review is unreasonable. See Smart v. Goord, 441 F. Supp. 2d 631, 645 (S.D.N.Y. 2006) (denying qualified immunity where defendants "made no showing with regard to either the conditions of . . . confinement or the extent to which confinements of similar duration may or may not be typical . . . .," proffered only conclusory allegations about asserted safety concerns, and failed to defeat arguments that procedural protections afforded to inmate were anything more than "hollow formalit[ies].").  Despite defendants' proffers to the contrary, at this juncture, for the reasons stated above, the undersigned cannot conclude that defendants' have met their burden in demonstrating that the policy was rationally related to a legitimate penological objective. Without proof of a compelling safety concern, neither defendants' actions can be deemed reasonable given the case law and constellation of circumstances surrounding Perez's IPC confinement.

Accordingly, it is recommended that defendants' motion on this ground be denied.

**E. PLRA**

Defendants correctly state that the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Had Perez sought recovery for compensatory damages related to emotional injury, such recovery would be precluded without showing a concomitant physical injury. Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999) ("[I]n the case of suits seeking damages for mental or emotional injuries . . . a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements [and make a prior showing of a physical injury]."). However, Perez seeks "comprehensic, punitive, damages" and makes no mention of linking the damages to emotional harm. Compl. at 4. Thus, defendants' argument is moot. Accordingly, for these reasons, defendants' motion is denied on this ground.


**F. Slander Claims**

Perez also attempts to assert a claim for slander. Defendants contend that, to the extent Perez has proffered state law claims, such must be dismissed for Perez's failure to file a notice of claim as required by New York General Municipal Law § 50-e. Defs. Mem. of Law (Dkt. No. 19 at 6-15) at 9-10. Regardless of whether the failure to file a notice of claim could be fatal to Perez's assertions, he has failed to allege a claim which the Court could recognize or choose to exercise supplemental jurisdiction over.

"A tort, such as slander, is not actionable under § 1983 unless it implicates a liberty interest." Davis-Payne v. Galie, No. 09-CV-6363 (MAT), 2012 WL 4959445, at *5 (W.D.N.Y.

28

Oct. 16, 2012) (citations omitted).  Alternately, even if the slander does not rise to the level of a constitutional claim, a court could exercise supplemental jurisdiction over the alleged pendant state law claim.  28 U.S.C. § 1367.  However, Perez has alleged no facts, let alone sufficient facts, to allow such a claim to continue.  <u>O'Diah v. Artus</u>, 887 F. Supp. 2d 497, 502 (W.D.N.Y. 2012) (declining to exercise jurisdiction over a conclusory slander claims where plaintiff failed to include any concrete harm or other "sufficient facts to make out such a claim.") (citaitons omitted).  There is no basis to consider this a constitutional violation or exercise supplemental jurisdiction.  Accordingly, to the extent Perez has attempted to state either federal or state based slander claims, such claims fail.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 19) be:

1. **GRANTED** as to defendants' claims to dismiss Perez's proffered state-based slander claims; and

2. **DENIED** in all other respects.[5]

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: June 13, 2013
      Albany, New York

*Christian F. Hummel*

Christian F. Hummel
U.S. Magistrate Judge

---

[5] Defendants move for summary judgment contending that Perez's Equal Protection claim be dismissed, they are entitled to qualified immunity, the PLRA precludes damages, and Perez's state-based slander claims should be dismissed. For the reasons discussed supra, defendants' motion is granted with respect to Perez's slander claims and denied in all other respects. Moreover, defendants failed to discuss the merit of Perez's inartfully pled due process claims which, for the reasons stated supra, should not be dismissed.